## GOODMAN MFG. CO. v. PITTSBURGH-BUFFALO CO.

(Circuit Court of Appeals, Third Circuit. May 17, 1920.)

Nos. 2523, 2524.

1. Corporations ⬳566(3)—Mortgagee not entitled to preference in insolvency because of failure to maintain sinking fund.

Under a mortgage of coal mine property, permitting corporate mortgagee to mine and sell coal free from lien, but requiring it to set aside 10 cents per ton on coal mined as a sinking fund against depletion and to apply the same in taking up bonds every six months, where mortgagor failed to maintain the sinking fund and became insolvent, the mortgagee held a creditor for the amount in arrears, but without lien therefor, and not entitled to preference.

2. Receivers ⬳152—Creditor waived right to preference by failure to demand payments when due.

Where receivers for a coal company continued to operate its property, which was subject to a mortgage requiring it to set aside an amount equal to 10 cents per ton for coal mined as a sinking fund to be applied each six months on the mortgage debt, they became liable for such payments as an administrative expense; but failure of the mortgagee to demand payments when due or to exercise the right to take possession, given by the mortgage, held a waiver of any right to preference from the fund remaining in receivers' hands at the close of their administration.

**3. Corporations ⟨⤳565(2)—Secured creditor may prove for full amount.**
On insolvency of a corporation, a mortgage creditor may prove his claim as a general creditor for the full amount then due, notwithstanding its subsequent reduction by foreclosure of the mortgage.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by the Goodman Manufacturing Company against the Pittsburgh-Buffalo Company. The Union Trust Company of Pittsburgh, as trustee and individually, appeals from decree. Modified and affirmed.

See, also, 222 Fed. 144.

Reed, Smith, Shaw & Beal, of Pittsburgh, Pa. (Samuel McClay, W. L. G. Gibson, and W. A. Seifert, all of Pittsburgh, Pa., of counsel), for appellant.

Wright, Chalfant & McCandless, of Pittsburgh, Pa., for receivers of Pittsburgh-Buffalo Co.

John S. Wendt, of Pittsburgh, Pa., for receivers of Federal Nat. Bank of Pittsburgh.

Before BUFFINGTON, WOOLLEY, and HAIGHT, Circuit Judges.

WOOLLEY, Circuit Judge. Pittsburgh-Buffalo Company, a corporation of Pennsylvania, was extensively engaged in mining and selling coal from a number of properties; some owned by itself, some owned by other concerns. Being heavily indebted, receivers for the coal company were appointed in 1913 by the District Court with authority to continue its business.

The properties owned by the coal company were encumbered by two mortgages held by the Union Trust Company of Pittsburgh, one in a fiduciary capacity and the other in its individual capacity. On the first, which was made to secure an issue of bonds, there was owing at the time of the appointment of receivers the sum of $1,766,000; and on the second there was due and owing the sum of $1,796,458.33. The coal company was not in default under the first mortgage in the payment of interest or principal, but it was in default on its covenant to maintain a sinking fund to provide against coal depletion and to pay therefrom for the redemption of the bonds issued under the mortgage a sum equal to ten cents per ton for each ton of coal mined and shipped from the mortgaged premises. On the second mortgage, the coal company was in default in the payment of interest.

The trust company mortgagee did not oppose the appointment of receivers, but rather acquiesced in their appointment and operation of the properties until the fall of 1914, when it instituted proceedings of foreclosure on the second mortgage. In July, 1915, it purchased the mortgaged premises at foreclosure sale subject to the lien of the first mortgage. Shortly afterward the receivers filed their account showing a balance of about $30,000 for distribution among creditors. Whereupon the trust company in its capacity of fiduciary mortgagee

under the first mortgage and as individual mortgagee under the second, filed claims against the fund. Under the first mortgage it claimed the sum of $279,465.15, made up of two items, one for $126,181.31, money due at the time of the appointment of receivers under the sinking fund provision of the mortgage requiring payment of 10 cents per ton on coal previously mined from the mortgaged premises, and the other for $153,283.84, money due under the same sinking fund provision for coal mined from the mortgaged premises by the receivers during their administration of the estate. Asserting a preference or priority in both claims, the mortgagee demanded under the allowance of either one or the other the whole fund remaining in the hands of the receivers for distribution. The master by his report subsequently approved by the District Court denied altogether the mortgagee's claim of preference, allowed as a general claim the sum claimed under the sinking fund for coal depletion during the receivership, and wholly disallowed the claim under the sinking fund provision for coal depletion prior to receivership. From the decree approving the report of the master over exceptions by the mortgagee this appeal was taken.

[1] The provisions of the first mortgage under which the mortgagee's claims were made and on which the court's rulings were based did several things. They preserved to the mortgagor under the law of Pennsylvania (and thereafter to its receivers under the court's order) the right to mine coal from the mortgaged premises and to sell it free from the lien of the mortgage. Hoskin v. Woodward, 45 Pa. 44; Angier v. Agnew, 98 Pa. 590, 42 Am. Rep. 624; Knoll v. N. Y. C. & St. L. R. Co., 121 Pa. 467, 15 Atl. 571, 1 L. R. A. 366. They imposed upon the mortgagor the duty to create and maintain a sinking fund and to pay therefrom semi-annually in retirement of the mortgage bonds an amount equal to 10 cents per ton for each ton of coal mined and shipped. They also conferred upon the mortgagee, upon default by the mortgagor of any of its covenants, the right to enter upon and take possession of the mortgaged premises and hold and manage the same as fully, to all intents and purposes, as the mortgagor could do. Under these provisions the mortgagor mined and sold coal from the mortgaged premises. In the course of time, it defaulted in its sinking fund covenant and mined and sold coal for which it did not pay. When receivers were appointed they began mining coal under authority of the court and continued to mine and sell it without objection from the mortgagee, either by informal complaint, so far as the record shows, or by formal action of entering into possession, as it might have done. It was not until after the mortgaged premises had been taken from the receivers by foreclosure sale under the second mortgage and the mining and sale of coal by the receivers had thereby been stopped that the mortgagee presented its claims for mine depletion under the sinking fund clause of the mortgage as preferred claims.

We are of opinion that the mortgagee's claims for mine depletion at the named rate per ton, disclose perfectly valid debts. Coal from the mortgaged premises was mined by the mortgagor, and later by its receivers, for which the mortgagor had obligated to pay the mortgagee

semi-annually a given rate per ton to make good the depletion of the mortgage security. This obligation became a debt when coal was mined and sold. About this there can be no doubt. The question is whether such a debt has the quality of a preference under the circumstances of the case.

While in the ground the coal was encumbered by the lien of the mortgage; but when mined and sold it was released from the lien, leaving as the mortgagee's sole security the mortgagor's promise to pay for it. Unless we were to hold that in the sale of coal, the lien, on being released from the coal, attached to the proceeds of sales, the mortgagee's claim for mine depletion prior to receivership is nothing more than the claim of an unsecured creditor. If on the other hand we were to hold that the lien was transferred from the coal to the proceeds of sales, this would, as to the first claim, avail nothing, for the proceeds of all sales prior to receivership had almost wholly, if they had not entirely, disappeared during the mortgagor's growing insolvency. Therefore, in either aspect, the mortgagee's claim for coal mined before the receivership in depletion of its security is reduced to a general claim. For reasons which do not appear, the referee disallowed this claim altogether. In doing so, we think he fell into error and that the order of the District Court affirming his report in this regard should be modified by allowing this claim as a general claim.

[2] The same provision of the mortgage which conferred upon the mortgagor the right to mine coal from the mortgaged premises and sell it free from the lien of the mortgage conferred a like right upon its receivers, and the same covenant that imposed on the mortgagor the obligation to pay the mortgagee for the coal it mined in depletion of its security imposed a like obligation on the receivers for the coal they mined. But the mortgagee goes further and insists that when the receivers mined coal, its lien on the coal was transferred to the proceeds of its sales, and that, in consequence, its claim constitutes a preference against the fund in their hands. This claim of preference cannot be maintained on any theory of a lien following the security in its devolution from coal to cash. Even if it could, it would not avail in this instance because it is frankly admitted that the small balance for distribution in the hands of the receivers represents the net proceeds from the sale of coal from other mines as well as from mines covered by the mortgage, and from the sale of personal property of various kinds, ranging from horses and wagons to stocks and bonds, cash recovered from accounts receivable, etc., on which the mortgagee had no lien of any kind, and that it is impossible to trace to this sum any proceeds from the sale of coal mined from the mortgaged premises.

The mortgagee's claim of priority to the fund in the hands of the receivers can be maintained, if at all, only on the theory that the mine depletion charge provided for by the sinking fund provision of the mortgage was an administrative expense imposed upon the receivers by their operation of the mortgaged premises and by their assumption of the mortgagor's covenants in the mortgage.

There would be substance in this contention, under authority of

familiar cases, were it not that the mortgagee is precluded by its conduct from availing itself of it. This conduct includes the mortgagee's full acquiescence in the operation of the mortgaged premises by the receivers, amounting so far as the record shows, practically to participation therein; its failure seasonably to demand or even remotely to intimate a claimed preference against the receivers for these charges, which, had it been made and been regarded as valid, would, doubtless, have induced the receivers to advise against the operation of the properties and would have impelled the court to order its discontinuance. In the conduct of the mortgagee with reference to the receivership is also included the mortgagee's failure (amounting to waiver) to avail itself of the right conferred by the mortgage immediately to step in and take possession of the property and thereby effectually to prevent the very depletion of its security, for which it now asks preferential payment.

We can conceive practical business considerations which may have moved the mortgagee to this line of conduct; but having pursued it and having availed itself of whatever advantages it afforded, the mortgagee cannot at the end of a receivership covering a long period make claim for the first time to a preference in the payment of the mortgagor's debt on the contention that it was an administrative expense arising from the receivers' alleged assumption of the mortgagor's covenant. If it were a valid administrative expense, it was due in part under the terms of the same covenant at the end of the first six months of the receivers' operation and was due in other parts at the end of every six months' period thereafter. At these periods, the mortgagee was silent.

We are of opinion that under the circumstances of this case the indebtedness of the receivers to the mortgagee for coal depletion, while constituting a debt created by the mortgage, does not constitute an administrative expense created by the receivers entitling the mortgagee to payment in preference to other claims against the fund. The decree of the court approving the report of the master that the claim be allowed as a general claim is affirmed.

[3] The remaining question on this appeal concerns the claim made by the trust company in its individual capacity as mortgagee under the second mortgage. On this mortgage, which contained no sinking fund clause providing against coal depletion, the coal company was in default as to interest at the time of the appointment of receivers in 1913. By leave of the court, the mortgagee foreclosed the mortgage and in July, 1915, purchased the mortgaged premises at foreclosure sale at a price which left due on the mortgage a balance of $404,217.59. The mortgagee filed its claim for the full amount of principal and interest due at the time of the appointment of receivers. The master allowed the claim only for the deficiency. From the court's order approving the master's action the mortgagee appealed.

In crediting the mortgage security at its sale value against the amount due on the face of the mortgage, and in restricting the mortgagee's claim to the balance remaining due, it is clear the master, and later the court, fell into error. This claim should have been allowed

the mortgagee for the full amount due on the mortgage when the receivers were appointed, notwithstanding its reduction later by resort to the security pledged. There was for a time a question whether a creditor should, while holding security or collateral, be permitted to prove his claim in full against an insolvent debtor, but that question, we think, has been finally decided by a line of authorities of great weight, culminating in Merrill v. National Bank of Jacksonville, 173 U. S. 131, 19 Sup. Ct. 360, 43 L. Ed. 640. In that case the Supreme Court held, that a secured creditor of an insolvent corporation may prove his claim for the full amount due at the time of the declaration of insolvency, without crediting either his collateral, or collections made therefrom after such declaration, subject, of course, to the proviso that when his claim has been paid in full either from dividends or from the proceeds of collateral realized on, he is not entitled to receive anything more. For a review of the authorities, see Miller's Appeal, 35 Pa. 481; Miller's Estate, 82 Pa. 113, 22 Am. Rep. 754; Chemical National Bank v. Armstrong, 59 Fed. 372, 8 C. C. A. 155, 28 L. R. A. 231; Merrill v. National Bank of Jacksonville, 173 U. S. 131, 19 Sup. Ct. 360, 43 L. Ed. 640.

We direct that the decree below be affirmed when modified in harmony with this opinion.